No. 26-6517

# In the United States Court of Appeals for the Fourth Circuit

EDWARD WOMBLE,

*Plaintiff-Appellant*,

v.

RAHIL PATEL *et al.*,

*Defendants-Appellees*.

*On Appeal from the United States District Court*
*for the Western District of North Carolina*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, *amicus curiae* states that no party to this brief is a publicly held corporation or entity, issues stock, or has a parent corporation.

## TABLE OF CONTENTS


| | Page |
|---|---|
| TABLE OF AUTHORITIES | iv |
| INTEREST OF *AMICUS CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 4 |
| I. Title II of the ADA Bars Disability Discrimination in Prisons, Including Failures to Accommodate | 4 |
| A. As Its Text and History Show, Title II Broadly Forbids Disability Discrimination by Public Entities Like Prisons | 4 |
| B. There Is No Carveout to Title II for Prison Medical Care | 6 |
| C. Even If Title II Had a Medical Carveout, Disability Accommodations Under Title II Are Not Medical Care | 9 |
| D. "Judge-Made" Exceptions Cannot Overwrite Title II's Clear Text and Foreclose Required Accommodations | 13 |
| II. The District Court Erred in Dismissing Womble's ADA Claim | 16 |
| CONCLUSION | 20 |

# TABLE OF AUTHORITIES


**Page(s)**

Cases

*Alexander v. Choate*,
469 U.S. 287 (1985) .......... 9

*Baxley v. Jividen*,
508 F. Supp. 3d 28 (S.D. W. Va. 2020) .......... 14

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .......... 7

*Brooks v. Colo. Dep't of Corr.*,
12 F.4th 1160 (10th Cir. 2021) .......... 2

*Bryant v. Madigan*,
84 F.3d 246 (7th Cir. 1996) .......... 3, 13-15

*Davis v. Keller*,
No. 7:23-cv-593, 2024 WL 4326544 (W.D. Va. Sep. 27, 2024) .......... 13, 14, 17, 18

*Erickson v. Pardus*,
551 U.S. 89 (2007) .......... 16

*Fauconier v. Clarke*,
966 F.3d 265 (4th Cir. 2020) .......... 5

*Furgess v. Pa. Dep't of Corr.*,
933 F.3d 285 (3d Cir. 2019) .......... 6, 15

*Haines v. Kerner*,
404 U.S. 519 (1972) .......... 16

*Jackson v. Dameron*,
171 F.4th 641 (4th Cir. 2026) .......... 4, 11, 12, 16

*Jaros v. Ill. Dep't of Corr.*,
684 F.3d 667 (7th Cir. 2012) .......... 9

*Kiman v. N.H. Dep't of Corr.*,
451 F.3d 274 (1st Cir. 2006) .......... 8

*Koon v. North Carolina*,
50 F.4th 398 (4th Cir. 2022) .......... 2

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Lesley v. Chie*,
250 F.3d 47 (1st Cir. 2001) .......... 8

*McDaniel v. Syed*,
115 F.4th 805 (7th Cir. 2024) .......... 12

*Montanez v. Price*,
154 F.4th 127 (3d Cir. 2025) .......... 2, 8, 9, 14

*Nat'l Fed'n of the Blind v. Lamone*,
813 F.3d 494 (4th Cir. 2016) .......... 9

*Olmstead v. L.C. ex rel. Zimring*,
527 U.S. 581 (1999) .......... 7

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) .......... 2, 3, 5, 7, 15

*Pierce v. District of Columbia*,
128 F. Supp. 3d 250 (D.D.C. 2015) .......... 10

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) .......... 7

*Tennessee v. Lane*,
541 U.S. 509 (2004) .......... 9

*United States v. Georgia*,
546 U.S. 151 (2006) .......... 2, 11, 18

Statutes, Regulations, and Legislative Materials

28 C.F.R. § 35.160 .......... 19

28 C.F.R. pt. 35, app. B .......... 6

42 U.S.C. § 12101 .......... 5

42 U.S.C. § 12102 .......... 4, 16

42 U.S.C. § 12131 .......... 5, 9, 16, 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

42 U.S.C. § 12132 ........................................................ 1-3, 5, 6, 8, 12, 16, 17, 19

Americans with Disabilities Act of 1990,
Pub. L. No. 101-336, 104 Stat. 327 ........................................................ 5, 6

H.R. Rep. No. 101-485, pt. 3 (1990) ........................................................ 7

S. Rep. No. 101-116 (1989) ........................................................ 6

Other Authorities

Jamelia N. Morgan, *Policing Under Disability Law*,
73 Stan. L. Rev. 1401 (2021) ........................................................ 8

*Webster's Third New International Dictionary* (1961) .............................. 6

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees. CAC also has a strong interest in ensuring that important federal statutes, like the Americans with Disabilities Act, are interpreted in a manner consistent with their text and history and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In other words, public entities may not, among other actions, discriminate against people with disabilities by excluding them from services, programs, and activities. To effectuate this prohibition, courts have long recognized that Title II imposes an affirmative obligation on public entities to provide reasonable

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. Counsel for Plaintiff-Appellant has consented to the filing of this brief; there is no docketed appearance on behalf of Defendants-Appellees.

accommodations that ensure people with disabilities receive meaningful access to the services, programs, and activities they provide. *See, e.g.*, *Koon v. North Carolina*, 50 F.4th 398, 406 (4th Cir. 2022); *Montanez v. Price*, 154 F.4th 127, 146 (3d Cir. 2025); *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021). And the Supreme Court has held repeatedly that Title II's sweeping language reaches prisoners in state custody, protecting them from discrimination "by reason of [their] disability." 42 U.S.C. § 12132; *see Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); *United States v. Georgia*, 546 U.S. 151, 157 (2006).

Notwithstanding the obligation Title II imposes on public entities to provide accommodations that ensure meaningful access, Defendants-Appellees denied Edward Womble, a North Carolina prisoner with a hearing disability, the battery he needed to make his hearing aid functional. JA33-34. When his hearing-aid battery died in April 2025, Womble immediately requested a replacement from prison staff and was repeatedly told that one was forthcoming. JA34. But he did not receive a new battery—and thus lived without a functional hearing aid—for nine months. JA34. During that time, he "lost hearing in his right ear," and so "miss[ed] overhead announcements, including meal, religion, medical and educational calls." JA34.

The district court nonetheless held that Womble could not bring a claim under the ADA because it concluded, in part, that Womble's request for a functional hearing-aid to accommodate his hearing disability was actually a claim about

"inadequate medical care" and so fell outside Title II's protections. JA38. That decision is at odds with the ADA's text, which prohibits discrimination with respect to *all* public "services, programs, [and] activities" and contains no exception for medical care. 42 U.S.C. § 12132. To be sure, courts have sometimes indicated otherwise, positing a "judge-made" exception to Title II's nondiscrimination mandate for prison medical care. But that case law stems from a single circuit-court decision that adopted an expressly atextual carveout from Title II for claims bearing on "the medical needs of . . . disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 248-49 (7th Cir. 1996). *Bryant* created that "[j]udge-made exception[]" to the ADA's broad textual protections to avoid the so-called "absurdity" of applying Title II to state prisoners, *id.*, a result the Supreme Court unanimously adopted just two years later, *see Yeskey*, 524 U.S. at 209. *Bryant* and its progeny are wrong and should not foreclose meritorious disability claims brought by state prisoners like Womble.

And even if such a carveout existed, Womble should still prevail because his request did not involve medical care at all. Instead, he sought a hearing-aid battery as an accommodation for his disability, to ensure he could meaningfully access the prison's nonmedical "services, programs, [and] activities." 42 U.S.C. § 12132. Hearing aids are a paradigmatic accommodation available under the ADA, as the statute's own implementing regulations recognize. *See infra* Section II. And Womble's complaint specifically challenged his exclusion from prison services—

including overhead announcements and the events they publicized—because of his hearing disability. *See* JA34. The district court thus erred in construing Womble's ADA claim for disability accommodations as a claim for inadequate medical treatment and dismissing it *sua sponte* as beyond the scope of Title II. That is all the more true because dismissal occurred at the screening stage, precisely when courts "must construe [a *pro se* prisoner's] pleadings liberally and in favor of the strongest arguments they suggest." *Jackson v. Dameron*, 171 F.4th 641, 644 (4th Cir. 2026). This Court should reverse.

## ARGUMENT

### I. Title II of the ADA Bars Disability Discrimination in Prisons, Including Failures to Accommodate.

#### A. As Its Text and History Show, Title II Broadly Forbids Disability Discrimination by Public Entities Like Prisons.

The Americans with Disabilities Act covers all individuals with any "physical or mental impairment that substantially limits one or more major life activities" or with a history or perception of such impairment. 42 U.S.C. § 12102(1). Its protections must be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted." *Id.* § 12102(4)(A). Title II of the ADA governs public entities, providing that "no [1] qualified individual with a disability shall, [2] by reason of such disability, [3] be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

These statutory terms are sweeping. As relevant here, a "qualified individual with a disability" includes any "individual with a disability" who—with or without accommodation—meets the bare "essential eligibility requirements" of a public service, program, or activity. *Id.* § 12131(2). And "public entity" includes "any State or local government," as well as any department, agency, or subunit thereof. *Id.* § 12131(1)(A), (B). This far-reaching "language unmistakably includes State prisons and prisoners within its coverage." *Yeskey*, 524 U.S. at 209; *see Fauconier v. Clarke*, 966 F.3d 265, 280 (4th Cir. 2020) ("Congress made [Title II] specifically applicable to the States and state entities, such as state prisons."). As the Supreme Court has unanimously recognized, "the ADA plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." *Yeskey*, 524 U.S. at 209.

The expansive scope of Title II's text reflects Congress's plan in passing the ADA. Enacted in 1990, the statute established a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 2(b)(1), 104 Stat. 327, 329 (codified as amended at 42 U.S.C. § 12101(b)(1)). Its stated purpose was "to invoke the sweep of congressional authority, including the power to enforce the

[F]ourteenth [A]mendment . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 2(b)(4). The ADA thus "provide[s] a clear and comprehensive national mandate to end discrimination against individuals with disabilities . . . and to ensure that the Federal government"—including the federal judiciary—"plays a central role in enforcing these standards on behalf of individuals with disabilities." S. Rep. No. 101-116, at 2 (1989).

### B. There Is No Carveout to Title II for Prison Medical Care.

Medical care, like all other prison "services, programs, or activities," falls within Title II's nondiscrimination mandate. 42 U.S.C. § 12132. The statutory phrase "services, programs, or activities" is "extremely broad in scope and includes anything a public entity does." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019) (quotation marks omitted); *see* 28 C.F.R. pt. 35, app. B ("All governmental activities of public entities are covered."). More specifically, a "service" is "conduct or performance that assists or benefits someone," including "professional or other useful ministrations." *Service*, *Webster's Third New International Dictionary* (1961). Medical treatment, which seeks to diagnose or heal individuals' existing ailments and to prevent future ones, is certainly a service for prisoners and, in any event, falls well within the "extremely broad" bounds of "services, programs, or activities." *Furgess*, 933 F.3d at 289 (quotation marks omitted). And there is no carveout to Title II liability that exempts prison medical

care from its categorical nondiscrimination mandate for public entities. *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.").

Indeed, it is well accepted that the ADA's broad bar on discrimination applies to medical care provided by public entities outside the prison context, *see, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 593-94, 607 (1999) (state care programs); *Rodde v. Bonta*, 357 F.3d 988, 995 (9th Cir. 2004) (county hospital), and Title II's "unambiguous statutory text" "provides no basis for distinguishing [prison] programs, services, and activities from those provided by public entities that are not prisons," *Yeskey*, 524 U.S. at 210, 212. Title II thus covers disability discrimination that occurs in the course of prison medical care. *See id.* at 210 ("Modern prisons provide inmates with many . . . medical 'services' . . . all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."); *see* H.R. Rep. No. 101-485, pt. 3, at 50 (1990) (documenting that incarcerated people with disabilities face "discriminatory treatment" accessing medical care).

Such discrimination can occur in at least two ways. First, it violates Title II when prisoners with disabilities *receive differential treatment* from medical staff because of their disability. That adverse treatment might stem from a provider's "discriminatory motive, such as animus, fear, or apathetic attitudes" or "rest[] on

stereotypes of the disabled rather than an individualized inquiry into the patient's condition." *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (quoting *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001)). Or medical staff might misunderstand a prisoner's disability as some other condition, like intoxication, and improperly deny medical services based on that misapprehension. *Cf.* Jamelia N. Morgan, *Policing Under Disability Law*, 73 Stan. L. Rev. 1401, 1433-34 (2021).

Second, it violates Title II when prisoners with disabilities are excluded from even *accessing* medical care because of their disability. Healthcare is a "quintessential service prisons must provide to prisoners." *Montanez*, 154 F.4th at 147. Title II thus bars prisons from excluding prisoners from medical care by failing to reasonably accommodate their disability. *See* 42 U.S.C. § 12132. Title II is violated, for example, if a prison refuses to provide accommodations that allow a prisoner in a wheelchair to access a medical office only reachable by stairs. So too if a prison denies a Deaf prisoner access to an ASL interpreter (or functional equivalent) necessary for interacting with a medical professional. Just as with any other service, program, or activity in a carceral setting, Title II requires that prisons provide reasonable accommodation to ensure that prisoners with disabilities can meaningfully access medical care. *See Montanez*, 154 F.4th at 147 (holding that a prisoner's denial of "meaningful access to 'medical care' *because of his disabilities*" is cognizable under Title II).

### C. Even If Title II Had a Medical Carveout, Disability Accommodations Under Title II Are Not Medical Care.

In any event, when prisoners like Womble seek disability accommodations under Title II to participate in nonmedical services, programs, or activities offered by the prison, such requests are not properly understood as challenges to their medical care at all.

Title II requires prisons "to make reasonable accommodations" that ensure prisoners with disabilities meaningful access to their programs, activities, and services. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016); *see Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Refusing to make reasonable accommodations is tantamount to denying access [to prison services]."); 42 U.S.C. § 12131(2) (contemplating "modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services"). After all, every public entity has an "affirmative obligation to make 'reasonable accommodations'" necessary for people with disabilities to "meaningfully access their programs, services, and activities." *Montanez*, 154 F.4th at 144 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985); and then citing *Tennessee v. Lane*, 541 U.S. 509, 532-33 (2004)). That obligation is "at its *apex* in the context of a prison," because "departments of corrections have complete control over whether prison inmates (disabled or not) receive any programs

or services at all." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.).

Here, for example, Womble was excluded from the prison's service of overhead announcements because he has a hearing disability and the announcements were delivered aurally. *See* JA34. He was also, as a result, denied the benefit of those announcements' calls for events related to food, religion, healthcare, and education. *See* JA34. Womble sought a functional hearing aid as an accommodation that took his existing hearing impairment as a baseline and would have intervened to let him access the prison's overhead announcements, among other services, notwithstanding that disability. This accommodation was not medical treatment: he did not seek a functional hearing aid to improve or alter his underlying hearing impairment.

To be sure, some interventions may be capable of operating as both a disability accommodation and a medical treatment, depending on the factual scenario. As an accommodation, a cane might help a prisoner with a mobility-related disability participate in programming in a distant wing of the facility. For another prisoner, the same cane may be a medically necessary part of treatment and recovery for a broken ankle. But the fact that a cane would, in this latter example, fulfill a different purpose for a different user in a different situation does not negate its role as a disability accommodation for those who need and seek it as such. Indeed, for some

individuals, the same intervention may both accommodate a disability and treat a medical condition. *See Jackson*, 171 F.4th at 660 n.4 (Floyd, J., dissenting) (identifying "wheelchairs, crutches, braces," and other interventions that could be an accommodation and treatment for the same person).

A Title II failure-to-accommodate claim is not foreclosed by the existence of any other claims a prisoner might bring, including constitutional or tort-law claims about their medical care, and is available regardless of whether that prisoner's disability accommodation could also be (or is) a medical treatment. This fact is unsurprising: two distinct legal claims often arise out of the same fact pattern. A prison's mistreatment of a prisoner with certain health conditions or impairments can generate plausible claims under both Title II (for disability discrimination) and, say, the Eighth Amendment (for deliberate indifference to a serious medical need). The Supreme Court expressly recognized as much in *United States v. Georgia*, which considered the mistreatment of a paraplegic state prisoner. There, the Court acknowledged that the "same conduct that violated the Eighth Amendment also violated Title II of the ADA." *Georgia*, 546 U.S. at 157; *see id*. (discussing the "deliberate refusal of prison officials to accommodate" a prisoner's "disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" as both an Eighth Amendment violation and an "'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's

'services, programs, or activities'" in violation of Title II (alterations in original) (quoting 42 U.S.C. § 12132)); *Jackson*, 171 F.4th at 660 & n.4 (Floyd, J., dissenting) (noting that in certain cases "the need for medical treatments arises simultaneously to the need for disability accommodations" because "both may stem from the same initial" issue).

Other courts have also acknowledged that even when medical professionals are involved, a single factual scenario may still give rise to both disability and medical-treatment claims. In *McDaniel*, for example, a prisoner with mobility disabilities brought parallel ADA and Eighth Amendment claims when prison staff rejected his request for a no-stairs housing unit. *See McDaniel v. Syed*, 115 F.4th 805, 818-19 (7th Cir. 2024). The court considered those claims separately, recognizing that Title II "address[es] mobility issues that affect a prisoner's ability to participate equally in programs and services, even if they might also relate to medical decisions" and emphasizing that "those decisions are not entirely off-limits from scrutiny under the ADA." *Id.* at 825; *see id.* at 825-26 ("Since *Georgia*, other circuits have treated decisions related to a prisoner's mobility as disability accommodation issues, not just as issues of allegedly inadequate medical treatment, even when medical staff were directly involved in denying a prisoner a claimed reasonable accommodation."). The court ultimately let McDaniel's disability claim proceed, notwithstanding the medical considerations linked to the denial. *See id.* at

812, 823, 828 (noting that prison "health-care professionals" believed that "walking up and down stairs[] could help McDaniel avoid developing muscle atrophy").

When a prisoner denied meaningful access to "services, programs, or activities" by reason of his disability seeks a particular policy modification, barrier removal, or auxiliary aid to restore such access, that request is one for a disability accommodation, not a medical treatment, and courts should assess it under Title II.

### D. "Judge-Made" Exceptions Cannot Overwrite Title II's Clear Text and Foreclose Required Accommodations.

Despite the broad sweep of Title II's text, some courts have held that certain failure-to-accommodate claims fall outside its statutory scope. These courts have concluded, first, that prisoners cannot bring ADA claims when those claims touch on prison medical care and, second, that a wide range of prison disability accommodations are actually requests for medical care (and so their denial is not actionable under Title II). Those cases largely draw on a single Seventh Circuit decision issued two years before the Supreme Court unanimously held that Title II applies to state prisons. *See Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996).[2]

*Bryant* considered whether a paraplegic prisoner, who broke his leg when a spasm caused him to fall while sleeping, could bring a claim under Title II after

[2] Although the court below did not cite *Bryant*, its holding traces directly back to that case. That court explained its ADA decision with a quote from a district-court case, *Davis v. Keller*, No. 7:23-cv-593, 2024 WL 4326544 (W.D. Va. Sep. 27,

prison officials denied him guardrails for his bed. *Id.* at 247-48. The court there held that Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Id.* at 249. But that mischaracterized what Bryant alleged. He argued that he needed bed guardrails as an accommodation for his disability (paraplegia and concomitant leg spasms) to make sleeping accessible. *See id.* at 247. The court's rejection of his request as a "special accommodation," *id.* at 249, is precisely backward: the lack of accommodation *is* the very discrimination the court claimed Bryant had not adequately "alleged," *id.*—and directly violated the prison's "affirmative obligation" under Title II to ensure Bryant's meaningful access to prison activities like sleeping, *Montanez*, 154 F.4th at 144.

As the Third Circuit recognized while considering several district-court cases' reliance on *Bryant* in a decision concerning access to prison showers, "[t]he problem with these cases' analysis [applying *Bryant*] is that complaints about not being provided an accessible shower are not allegations of medical malpractice or disagreements about medical treatment. They are requests for reasonable

---

2024). *See* JA38 (quoting *Davis*, 2024 WL 4326544, at *8). *Davis* in turn quoted that language from another district-court case, *Baxley v. Jividen*. *See* 508 F. Supp. 3d 28, 62 (S.D. W. Va. 2020) ("[T]he ADA cannot be used to assert a claim of inadequate medical care."). And *Baxley* quoted *Bryant*'s statement that Title II "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Id.* at 60 (quoting *Bryant*, 84 F.3d at 249).

accommodations so that inmates with disabilities can take a shower—just like able-bodied inmates." *Furgess*, 933 F.3d at 291; *see id.* at 290 (concluding that courts have "improperly relied" on *Bryant* to foreclose relief for claims that adequately allege disability discrimination).

Nor can *Bryant*'s reasoning hold up against the text of Title II, as the decision itself acknowledged, observing that "[j]udge-made exceptions to laws of general applicability are justified to avoid absurdity." *Bryant*, 84 F.3d at 248-49 (internal citation omitted); *see id.* at 249 (acknowledging that a postulated reading is "not express" in the statutory text).[3] As discussed above, there is no carveout to Title II's broad protections for discrimination in prison medical care. Indeed, there are many scenarios in which a prison's "fail[ure] to attend to the medical needs of its disabled prisoners," *Bryant*, 84 F.3d at 249, violates Title II, including when medical providers' treatment is improperly tainted by their reaction to a prisoner's disability, when medical services are inaccessible to prisoners with disabilities, or when the same fact pattern gives rise to both disability and non-disability-related claims.

---

[3] The so-called "absurdity" *Bryant* invoked to justify its atextual carveout for prison medical care—namely, the idea that Title II covers state prisoners—was unanimously adopted by the Supreme Court two years later. *See Bryant*, 84 F.3d at 248 ("It is very far from clear that prisoners should be considered 'qualified individual[s]' within the meaning of the Act. Could Congress really have intended disabled prisoners to be mainstreamed into an already highly restricted prison society?" (alteration in original)). *Contra Yeskey*, 524 U.S. at 210.

## II. The District Court Erred in Dismissing Womble's ADA Claim.

Because Womble made out a *prima facie* claim of disability discrimination under Title II, the district court erred in concluding that he "failed to allege[] facts supporting the elements of [his] ADA claim." JA38. That error is especially striking because district courts screening prisoners' *pro se* complaints "must construe the pleadings liberally and in favor of the strongest arguments they suggest." *Jackson*, 171 F.4th at 644; *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*per curiam*); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*per curiam*).

First, Womble is a "qualified individual with a disability." 42 U.S.C. § 12132. Hearing loss is a disability under the ADA, affecting "major life activities" like "hearing" and "communicating." *Id.* § 12102(1)(A), (2)(A). And "with . . . the provision of auxiliary aids," namely a functional hearing aid, Womble could have received the services the prison provided aurally. *Id.* § 12131(2). Second, Womble was "excluded from participation in" and "denied the benefits of the services, programs, or activities" administered by the prison. *Id.* § 12132. As alleged, Womble "miss[ed] overhead announcements, including meal, religion, medical and educational calls" for at least nine months. JA34. He was thus excluded from the prison's service of overhead communications about various events (and faced further barriers accessing the benefits of such events related to food, religion, healthcare, and education). Third, that adverse treatment occurred "by reason of [Womble's]

disability." 42 U.S.C. § 12132. Without a functional hearing aid, Womble's hearing impairment caused him to miss receiving overhead prison announcements.

The district court also rejected Womble's Title II claim on the ground that "the ADA cannot be used to assert a claim of inadequate medical care." JA38 (quoting *Davis v. Keller*, No. 7:23-cv-593, 2024 WL 4326544, at *8 (W.D. Va. Sep. 27, 2024)). That is error twice over. As described above, the ADA does not carve out medical care from Title II's sweeping ban on disability discrimination in public services, activities, and programs. The district court thus erred in suggesting that a Title II claim that deals with a prisoner's medical care could be dismissed for that reason alone. If the court understood Womble's Title II claim as challenging his medical care, it should have evaluated that claim under the same longstanding framework courts use to assess disability discrimination in all other domains, including both medical care outside of prisons and the mine run of other prison services.

To buttress its contention, the court below cited a single case, *Davis v. Keller*. *See* JA38 (quoting *Davis*, 2024 WL 4326544, at *8). But that unpublished district-court decision does not support dismissal of Womble's ADA claim. In that case, Davis brought a Title II claim against prison staff for failing to accommodate his opioid-use disorder with a "diversion-proof form of Suboxone." *Davis*, 2024 WL 4326544, at *3. The *Davis* court perfunctorily rejected Davis's claim because it was

"based on the same allegations as his deliberate indifference claims—namely, that he was denied proper medication." *Id.* at *8. That approach is misplaced: as discussed above, and as the Supreme Court recognized in *United States v. Georgia*, a prison's mistreatment of a prisoner with certain health conditions or impairments can support causes of action under both Title II and the Eighth Amendment. *See Georgia*, 546 U.S. at 156-57 (acknowledging that a single prison fact pattern can give rise to both a Title II disability-discrimination claim and an Eighth Amendment deliberate-indifference claim); *supra* Section I.C.

In any event, the district court also erred by misunderstanding Womble's complaint. In the context of Womble's ADA claim, the requested battery (along with the hearing aid itself) was an accommodation for his hearing impairment. It was not a challenge to his medical care at all, but a claim about his exclusion from prison services based on his hearing disability, exactly the sort of discrimination by a public entity the ADA prohibits. To start, Title II identifies the "removal of . . . communication . . . barriers" and "the provision of auxiliary aids" as accommodations that can be used to facilitate the "receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The statute's implementing regulations are more explicit, providing that prisons must "furnish appropriate auxiliary aids . . . where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the

benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1); *see id.* § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.").

These regulations underscore that Defendants-Appellees' failure to provide a functional hearing aid thereby denied Womble meaningful access to the prison's services, programs, and activities. Prison staff did not "give primary consideration to the requests of individuals with disabilities" when "determining what types of auxiliary aids . . . [were] necessary" for Womble; did not provide auxiliary aids "in a timely manner"; and did not provide an accommodation that "protect[ed] the . . . independence of the individual with a disability," insofar as Womble was excluded from receiving and responding to overhead announcements like all other prisoners. *Id.* § 35.160(b)(2).

In short, by denying Womble the hearing-aid battery aid he requested (and thus a functional hearing aid), Defendants-Appellees "excluded [him] from participation in" and "denied [him] the benefits of the [prison's] services, programs, or activities." 42 U.S.C. § 12132. Title II does not permit that discrimination, and the district court's *sua sponte* dismissal at the screening stage was error.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court as to Womble's ADA claim.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Joshua D. Blecher-Cohen
Nina G. Henry
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: September 9, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,622 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 9th day of September, 2026.

*<u>/s/ Brianne J. Gorod</u>*
Brianne J. Gorod

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of September, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: September 9, 2026

*/s/ Brianne J. Gorod*
Brianne J. Gorod